## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JENNIFER JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:03cv1170-D** |
| | ) | |
| **CINTAS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.  INTRODUCTION

Before the court is Defendant Cintas Corporation's ("Cintas") motion for summary judgment.  (Doc. No. 14.)  A brief and an evidentiary submission accompany the motion.[1] (Doc. Nos. 16, 47.)  Plaintiff Jennifer Jackson ("Jackson") submitted a response and an evidentiary submission.  (Doc. No. 27.)  Thereafter, Cintas filed a reply and a supplemental brief.  (Doc. No. 48-49.)  Jackson also filed a supplemental brief.  (Doc. No. 52.)

---

[1] Jackson moved to strike Cintas' motion for summary judgment and related briefs on the ground that, when citing deposition pages, Cintas failed to provide "line" references, as required by the court's uniform scheduling order.  (Doc. No. 37.)  Cintas responded in part by filing a "corrected" brief, reply and supplemental brief with line references.  (Doc. Nos. 47, 48, 49.)  Consequently, the court denied Jackson's motion to strike.  (Doc. No. 45.)  Herein, the court refers to the docket numbers assigned to Cintas' "corrected" summary judgment pleadings.

Subsequently, the court entered an order, directing a limited reopening of the summary judgment record.  (Doc. No. 60.)  Cintas filed a response to the court's order (Doc. No. 62), to which Jackson submitted a reply.  (Doc. No. 63; see also Doc. No. 64.)

Cintas moves for summary judgment on Jackson's claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and state law.  Her claims are premised on allegations that, during her employment with Cintas, commencing somewhere in the time frame between February 1998 and June 1998, and continuing intermittently until approximately March 2002, Jackson's supervisor, Chris Angell ("Angell"), sexually harassed her.  The alleged sexual abuse took a variety of forms:  Angell implied that performing oral sex on him would result in advancement at Cintas; he engaged Jackson in lewd propositions for sex on a daily basis for at least a year; he boasted of his sexual agility; twice, he grabbed his loins as an illustration of how Jackson aroused him; and, on two different occasions, he touched her breast.

The court carefully has examined the arguments of counsel, the relevant law and the record as a whole.  For the reasons stated herein, as to the Title VII claim, the court finds that genuine issues of material fact exist as to whether there is actionable harassment under Title VII, and whether Cintas avoids liability based on the affirmative defense enunciated by the Supreme Court of the United States in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  The court, however, finds that summary judgment is due to be granted on the state law claims.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) (citations omitted).  This determination involves applying substantive law to the substantive facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed.  See id. at 248; Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  STATEMENT OF FACTS[2]

### A.  Cintas' Operations and Hierarchy

Jackson's employer, Cintas, provides multiple business services, including uniform rentals and sales.  (John Laurenzi Aff. ¶ 2 (Ex. to Doc. No. 22).)[3]  On February 18, 1998, Jackson began working for Cintas in its Montgomery distribution center as an hourly employee in a position called "special operations" and remains employed in this position.[4]  (Pl. Dep. at 11-12 (Pl. Ex. 1 to Doc. No. 27); (see also Pl. "Employment Status" form (Ex. to Pl. Dep.)); (Pl. E.E.O.C. Aff. ¶ 1 (Ex. to Compl. (Doc. No. 1).)  Cintas refers to its

---

[2] When deciding a motion for summary judgment, the court views the facts and all reasonable inferences in favor of the nonmoving party.  See Celotex, 477 U.S. at 322.  This statement of facts, thus, may not represent the actual facts.

[3] Laurenzi has worked as the human resources manager for Cintas' Montgomery distribution center since December 16, 2002.  (Laurenzi Aff. ¶ 1.)

[4] Jackson states that she "prepares uniforms," (Pl. Dep. at 11-12), but there is no further elaboration in the record as to her job duties.

4

hourly employees, such as Jackson, as "partners."  (Douglas Dep. at 132 (Def. Ex. 3 to Doc. No. 16)); (Holloman Dep. at 13-14 (Def. Ex. 5 to Doc. No. 16).)

The Montgomery distribution center is part of Cintas' distribution division. (Laurenzi Aff. ¶ 2.)  The distribution center "warehouses, customizes and distributes products to Cintas' rental locations and also directly to Cintas' customers."  (Id.)

The highest ranking official at the Montgomery distribution center is the general manager.  (Id. ¶ 4.)  The general manager reports to the vice president of the distribution and production planning division.  This vice president works in Cintas' headquarters in Cincinnati, Ohio.  (Id.)

The distribution center operates twenty-four hours per day, with three shifts. (Id. ¶ 5.)  There are three production supervisors, one for each shift, who directly supervise the hourly employees.  (Id.)  The three production supervisors report to the production manager,[5] who in turn reports to the on-site general manager.[6]  (Id.)

During the time frame of the events at issue in this lawsuit, Carmen Douglas ("Douglas") worked as the human resources manager at the Montgomery distribution

---

[5] The various summary judgment documents refer to both a "production manager" and an "operations manager."  It is unclear whether these two titles are used interchangeably to denote a single job position at the Cintas Montgomery distribution center or whether they represent two different positions.  (See Douglas Dep. at 102 (Def. Ex. 3 to Doc. No. 16)); (Def. Resp. to Pl. 1st Interrogs., No. 1 (Pl. Ex. A. to Holloman Dep. & Doc. No. 27)); (John Laurenzi Aff. ¶ 5 (Ex. to Doc. No. 22)); (Def. Br. at 2 & n.3 (Doc. No. 47).) For purposes of resolving the instant motion, it is unnecessary for the court to resolve the ambiguity; the court merely notes its existence.

[6] Jackson does not dispute the foregoing facts pertaining to Cintas' operations and business structure.  (Doc. No. 27 at 1.)

center.  (Douglas Aff. ¶ 3 (Ex. B to Doc. No. 62).)  Also, during the relevant time period,

Kristi Clement-Williams ("Clement-Williams") held the position of director of human

resources for Cintas' distribution and production planning division in Cincinnati, Ohio.

(Clement-Williams Aff. ¶¶ 1, 7 (Ex. A to Doc. No. 62).)  In that position, Clement-

Williams "had oversight" over the Montgomery distribution center where Jackson works.

(Id.)

Jackson complains that her superior, Angell, sexually harassed her.  (Pl.

Dep. at 28.)  Angell began employment with Cintas in August 1996.  When Jackson was

hired, Angell was the production supervisor for the second shift.  He directly supervised

approximately thirty-five employees, including Jackson.  (Pl. Dep. at 24); (Angell Dep.

at 5 (Def. Ex. 4 to Doc. No. 16 & Pl. Ex. 5 to Doc. No. 27)); (Def. Resp. to Pl. 1st

Interrogs., No. 1 (Pl. Ex. A. to Doc. No. 27)); (Def. Resp. to Pl. E.E.O.C. charge at 2 (Pl.

Ex. F attached to Holloman Dep. & Doc. No. 27).)

In June 1998, Angell relocated to Cintas' distribution center in Chicago, Illinois.

The harassment ceased during this period when Angell was in Chicago.  (Angell Dep. at 5

(Def. Ex. 2 to Doc. No. 16 and Pl. Ex. 5 to Doc. No. 27)); (Def. Resp. to Pl. 1st Interrogs.,

No. 1).)  Angell, however, returned to the Montgomery distribution center in June 1999 as

operations manager.  (Def. Resp. to Pl. 1st Interrogs., No. 1.)  In this position, Angell did

not directly supervise the hourly employees; instead, the production supervisors reported

to him.  (Douglas Dep. at 46 (Def. Ex. 3 to Doc. No. 16).)

In March 2001, Angell was promoted to general manager at the Montgomery distribution center.  (Def. Resp. to Pl. 1st Interrogs., No. 1 (Pl. Ex. A to Doc. No. 27).)  As general manager, he reported to Phillip Holloman ("Holloman"), vice president of the distribution and production planning division in Cincinnati, and later to Holloman's successor, Greg Emrick.  (Def. Resp. to Pl. 1st Interrogs., No. 1.)  Angell served in this position until June 7, 2004.  Although the parties dispute whether Cintas demoted Angell or whether Angell voluntarily stepped down, it is undisputed that, on June 7, Angell returned to the position of second-shift production supervisor and suffered a 38 percent salary reduction.  (Def. Resp. to Pl. 1st  Interrogs., No. 1); (see also Angell "Employee Status Notification" form (Pl. Ex. to Holloman Dep. & Doc. No. 27)) (Def. Br. at 2 (Doc. No. 47)); (Pl. Resp. at 9 (Doc. No. 27)); (Angell Dep. at 5-6.)

B.  The Sexual Harassment and Cintas' Investigation after Jackson's Complaint

From day one of Jackson's employment, Jackson was wary of Angell.  His sexual prowess was a topic of conversation in the Montgomery distribution center.  There were many discussions among hourly employees about his alleged sexual affair with a subordinate employee, and rumors abounded that he had impregnated her.  (Pl. Dep. at 215-220); (Michelle Harris Aff. ¶¶ 4-5 (part of Pl. Ex. 4 to Doc. No. 27)); (Douglas Dep. at 71-73, 79-80); (Pl. E.E.O.C. Aff. ¶ 4.)

Jackson's intuition proved correct, as Angell wasted no time honing in on Jackson.  At the outset of Jackson's employment, Angell, who at the time was her direct supervisor,

7

began harassing her.  Angell told Jackson that "doing special things gets you high places" at Cintas, and he defined "special things" as "going down" on him.  (Pl. Dep. at 43-47); (Pl. E.E.O.C. Aff. ¶ 8); (see also Def. Br. at 3 (Doc. No. 47).)

Once, out of sight of other employees, Angell "grabbed" his "privates" in front of Jackson.  (Pl. Dep. at 94-95.)  Angell grabbed his genitals again on another occasion and told Jackson that she aroused him whenever she was in his presence.[7]  (Id. at 95-96).

Although Angell transferred to Cintas' Chicago distribution center in June 1998, only four months after Jackson began her employment, the harassment resumed after Angell was promoted to general manager in March 2001.  (Def. Br. at 2 (Doc. No. 47) (citing Pl. Dep.)); (Def. Resp. to Ct. Order at 2 (Doc. No. 62)); (see also supra, footnote 7.)

Initially, the sexual harassment comprised sexual comments, as described above, but Jackson recalls that the comments became more intense and escalated into physical contact in 2001 when Angell learned that Jackson was contemplating divorce

---

[7] These two "grabbing" incidents occurred prior to September 2001.  Cintas has estimated the dates of the alleged harassment, or where unworkable set forth a general time frame of the conduct, primarily by cross-referencing Jackson's testimony with other events in the record, such as Holloman's visit to the Montgomery plant in September 2001.  Jackson has not seriously challenged the dates offered by Cintas.  Her lawyer's statement in brief that Angell recommenced verbal harassment in 1999 does not contain a proper cite to the evidentiary record, and the court has been unable upon independent review to find evidentiary verification for the 1999 date.  (See Pl. Resp. at 2 (Doc. No. 27)); see also Skyline Corp. v. N.L.R.B., 613 F.2d 1328, 1337 (5th Cir. 1980) ("Statements by counsel in briefs are not evidence.").  The court, thus, has relied on Cintas' reconstructed dates and time periods.  (See, e.g., Def. Br. at 3 & n.5 (Doc. No. 47).)

proceedings.  (Pl. Dep. at 184-85, 187-88); (Pl. Resp. at 3 (Doc. No. 27)); (Pl. E.E.O.C. Aff. ¶ 5.)  Twice, Angell touched Jackson's breast.  (Pl. Dep. at 91, 123.)  On one occasion, Jackson explains:  "I was in the pick lane.  I was doing another job.  And he come through [sic] and just touched my breast . . . [and said,] '[O]oh, I touched a tit.'  And he kept walking."  (Id. at 92.)  Jackson does not remember precisely when this incident occurred, only that it happened prior to September 2001.  (Id. at 93); (Holloman Dep. at 13-14); (Def. Br. at 3 & n.5 (Doc. No. 47)).)

The second time, in February 2002, Jackson went to Angell's office to give Angell a document.  (Pl. Dep. at 87); (Pl. E.E.O.C. Aff. ¶ 6.)  After reviewing the document, Angell decided to return it to Jackson.  (Pl. Dep. at 87-88.)  Because Jackson had other documents in her hands, Angell placed the document in her right chest pocket.  (Id. at 88.)  As he withdrew his hand, he touched her breast and "smirked."  (Id. at 89-90.)

Moreover, during this time period, the sexual comments continued.  Beginning in 2001, when Angell was promoted to general manager, and continuing to mid-March 2002, "[a]lmost every time" Jackson encountered Angell which essentially was every day, Angell told her that he would like to take her into the conference room, lock the door, "lay [her] on the table and wear [her] out."  (Id. at 57, 72-77.)  Angell would express these sentiments to Jackson "several" times a day and make certain that no other employee overheard his propositions.[8]  (Id. at 73, 75.)

---

[8] Jackson defines "several" as "more than three," "a lot" and "every time he would talk to me."  (Pl. Dep. at 73.)

9

In response to Angell's overtures, Jackson tried to ignore Angell.  She would always "walk[] away" from him.  (Pl. E.E.O.C. Aff. ¶¶ 6, 8); (see also Pl. Dep. at 83.)

In the midst of the sexual harassment, in September 2001, Holloman visited the Montgomery distribution center as he did from time to time.  While there on this occasion, Holloman approached Jackson twice while talking with employees on the plant floor.  Although unaware of Angell's behavior toward Jackson, he sensed that something was troubling Jackson and, thus, asked her if she needed to talk.  (Pl. Dep. at 54-57, 84-85); (Holloman Dep. at 13-14.)  Jackson, however, was "scared" to tell Holloman about the harassment.  (Pl. Dep. at 55-57.)  Before Holloman left that day, he gave her a business card in the event that she needed to contact him.  (Id. at 56.)

Angell's harassment continued after Holloman's departure.  In addition to Angell's repeated invitations to Jackson to have sexual intercourse in the conference room, in approximately January 2002 (see Def. Br. at 4, ¶ 6 (Doc. No. 47)), Angell told Jackson that he left a bowling alley "horny" one Saturday night.  He said that he wanted to call Jackson, but could not find her home phone number.  (Pl. Dep. at 79-80, 123-24, 230); (Pl. E.E.O.C. Aff. ¶ 7.)

On March 22, 2002, Angell told Jackson that he could "go all night."  (Pl. Dep. at 76, 80-81.)  Jackson "put [her] hand on [her] hip" and glared at him.  (Id. at 81.)  Angell responded that he was "going to leave [her] alone," because he knew that she was "going to get [him] in trouble."  (Id. at 57, 81, 104, 108.)

The following Monday, March 25, Holloman again visited the Montgomery distribution center.  While Holloman was there, Jackson told him and Angell that she wanted to talk to them.  (Id. at 98-99, 149, 178.)  A meeting, though, did not transpire that day between Holloman and Jackson.  (Id. at 99, 118.)  Jackson, however, did meet with Angell.  Jackson secretly recorded the meeting in order to amass proof of the sexual harassment.  (Id. at 59-61, 182, 188-89); (see also, infra, footnote 10.)

During her conversation with Angell, Jackson hinted that she was considering reporting Angell's sexual harassment to Holloman.  (Pl. Dep. at 209.)  In response, Angell repeated his concern that Jackson was going to get him in trouble, and he promised to "leave [her] alone."  (Id. at 192-94.)

Although Jackson did not report the harassment after her latter conversation with Angell, it appears that she confronted Angell on April 3 and told him she had made a definite decision to tell Holloman about the sexual harassment.  (Id. at 202-03, 208-09, 211-12, 236-37.)  Apparently, Jackson told Angell that Holloman had called her and that she was going to talk to Holloman that evening and report the harassment.  (Id. at 201-03.)

After Jackson confronted Angell and outside of her presence, Angell contacted Holloman and told him that Jackson had made a false accusation of sexual harassment against him.  (Holloman Dep. at 39); (Angell Dep. at 23-25, 33.)  Angell told Holloman that Jackson was manufacturing the incidents of harassment because she was upset that he had not given her an award at a recent "company gala."  (Pl. Dep. at 101, 106-09);

(Angell Dep. at 33); (Pl. E.E.O.C. Aff. ¶ 8.)  Holloman asked Angell whether the allegations were true to which Angell responded, "[A]bsolutely not."  (Angell Dep. at 24); (Def. Resp. to Pl. 1st Interrogs., No. 8.)  Holloman instructed Angell to report the accusation to Douglas and "to remain out of" and not interfere with any investigation. (Angell Dep. at 24-25.)

That same day, on April 3, Angell complied with Holloman's directive and told Douglas that Jackson was accusing him of sexually harassing her.  As a result of Angell's and Douglas' conversation, during which Angell again denied the accusations, Douglas initiated a meeting with Jackson.  This meeting also took place on April 3.[9]  (Pl. Dep. at 65-66, 71, 103, 228-29); (Douglas Dep. at 88, 109, 138); (Def. Resp. to Pl. 1st Interrogs., No. 7.)

During this meeting, Jackson for the first time reported to a managerial employee that Angell had sexually harassed her.  Jackson gave Douglas the names of two co-employees who had not witnessed any of the harassment, but with whom Jackson previously had discussed Angell's advances toward her.  (Pl. Dep. at 66-67); (Douglas Dep. at 89.)

Jackson met with Douglas and Holloman, individually and/or together, on April 3, 10 and 11.  (Pl. Dep. at 82, 91, 111, 117, 228); (Holloman Dep. at 45, 53); (Douglas Dep. at 51, 94-95, 98); (Pl. E.E.O.C. Aff. ¶ 9.)  On two separate occasions, Douglas and

---

[9] Apparently, Jackson did not speak to or directly report the harassment to Holloman on April 3.

Holloman interviewed the employees identified by Jackson.  They also took a statement

from Jackson.  (Pl. Dep. at 67-71, 105, 108, 114-15); (Pl. E.E.O.C. Aff. ¶ 13); (Holloman

Dep. at 45, 102); (Douglas Dep. at 90, 97-99, 124-25); (Def. Resp. to Pl. 1ˢᵗ Interrogs.,

No. 8.)

Holloman was "in charge" of the investigation which concluded on April 11, 2002.

(Holloman Dep. at 43); (Douglas Dep. at 98.)  During the course of the investigation,

Holloman informed Jackson that Cintas "does not tolerate harassment," and that, if

Angell had harassed her, he would be "punished."  (Pl. Dep. at 121.)  Holloman also "sat

down" with Angell and informed him in "no uncertain terms" that, if the allegations

against him by Jackson proved true, Angell would be fired.  (Holloman Dep. at 20-21.)

Angell believed this directive from Holloman to constitute "action" and "discipline."  (Id.

at 21.)

Ultimately, Douglas and Holloman concluded that their investigation did not

corroborate Jackson's story.[10]  (Pl. Dep. at 77-78, 85, 241-42); (Douglas Dep. at 91-92,

109.)  Holloman, though, told Jackson that he hoped she would continue working for

Cintas and "continue to do a solid job."  (See Exs. 1-4 at 22 (Doc. No. 27).)  He also

---

[10] Jackson secretly recorded two conversations with Angell, one on March 25, 2002,
and another on April 3, 2002.  She also recorded her initial meeting with Douglas on
April 3, as well as three subsequent investigative meetings with Holloman and Douglas.
(See Exs. 1-4 to Doc. No. 27); (Pl. Dep. at 61-65).)  The recordings have been transcribed
and are part of the summary judgment record.  (Id.); (see also affidavits attached to Exs.
1-4 to Doc. No. 27).)  During Cintas' investigation of her allegations, however, Jackson
never revealed that she had these tape recordings, but, in retrospect, she "wishe[s]" that
she had.  (Pl. Dep. at 78, 166.)

"strongly suggest[ed]" that Jackson report any future problems.  (Id.)  Jackson felt as if her worst fears had come true because neither Holloman nor Douglas believed her.  (Id. at 78, 121-22.)

Cintas did not "formal[ly] discipline" Angell.  (Def. Resp. to Pl. 1st Interrogs., No. 8.)  Angell, however, was "remind[ed]" of Cintas' sexual harassment policy and instructed "to only interact with [] Jackson in the presence of third parties."  (Id.)

Jackson says that she did not know to whom she could complain about the harassment.  (Pl. Dep. at 35-36, 84.)  In any event, Jackson says that she never reported the harassment because she was fearful.  She was "scared" to tell Holloman, even when he approached her (id. at 56-57, 85, 150), and she did not feel that Douglas was "approachable."  (Id. at 48.)  Her fear stemmed initially from an apprehension that she would lose her job if she complained, but Holloman apparently allayed that fear after she finally reported the harassment.  (Id. at 267.)  She also attributes her fear to the fact that management took no retributive action against Angell, but instead promoted him, despite rumors of Angell's affair with a subordinate employee.  (Pl. Resp. at 3 (Doc. No. 27)); (Pl. Dep. at 61, 6-9, 163-64, 166, 243.)  She also said, that given Angell's managerial position, employees told her that it would be her word against Angell's.  She, thus, "felt like they [management] wouldn't believe [her]."  (Pl. Dep. at 77, 266-67.)

After Jackson confronted Angell on March 25, 2002, Jackson says that the sexual harassment stopped and has not resumed.  (Pl. Dep. at 65-67, 76, 57-58, 65-66; 86,

104-05, 124-25); (Douglas Dep. at 110-111.)  Jackson has not since that time complained of sexual harassment by Angell.  (Pl. Dep. at 111-12.)

Jackson continues to work for Cintas.  Although Angell no longer sexually harasses her, Jackson says that Angell acts distant and aloof toward her and that other managerial employees more closely scrutinize her work for errors.  (Id. at 125-27, 130-41, 150-51, 155-56.)  She also complains that several co-employees were terminated for supporting her complaint of sexual harassment.  (Id. at 262-63.)


C.  Cintas' Anti-Harassment Policy and Training

Cintas has a policy which prohibits sexual harassment in the workplace and provides a mechanism for employees to report sexual harassment.  (Policy (Def. Ex. 16 to Doc. No. 16).)  Cintas established its anti-harassment policy on October 7, 1993, and a corporate memorandum dated the same date dictates that managers are responsible for educating their subordinates on the policy.  (Def. Resp. to Ct. Order ¶ 2 (citing Clement-Williams Aff. ¶ 2 & Ex. 1 attached thereto) (Doc. No. 62).)

The anti-harassment policy is contained in Cintas' Partner Reference Guide. (Policy (Def. Ex. 16 to Doc. No. 16).)  The Guide is an employee handbook which outlines Cintas' policies, procedures and standards of conduct.  (Laurenzi Aff. ¶ 6.) Although the Guide and policy were in place when Jackson was hired, she did not receive a copy of either at that time, nor was she told that Cintas had an anti-harassment policy. (Pl. Dep. at 24-26.)  Jackson says, however, that a representative of Cintas, whose identity

15

she does not remember, verbally assured her when she was hired that her work environment would be free of sexual harassment.  (<u>Id.</u> at 29-31, 33-35, 38.)

Jackson was not given a Partner Reference Guide until January 2002.  (<u>Id.</u> at 24-26.)  Her receipt is evidenced by her signed acknowledgment on January 9, 2002, that she had "reviewed the Cintas Partner Reference Guide."  (Def. Ex. 15 to Pl. Dep. (Doc. No. 16)); (Pl. Dep. at 24-26.)  Jackson says, though, that in fact she did not read the Guide (Pl. Dep. at 26), but instead assumed that a Cintas representative eventually would explain it to her.  (<u>Id.</u>)

The anti-harassment policy printed in the Partner Reference Guide, the one which Jackson apparently received, recites Cintas' prohibition against "sexual and other harassment of its partners," defines sexual harassment, forewarns that such conduct "may result in disciplinary action up to and including termination," and provides that retaliation against a partner for making a report of harassment "is prohibited and will not be tolerated."[11]  (Policy (Def. Ex. 16 to Doc. No. 16).)  As to the procedures in place to report harassment, the Guide provides as follows:

> Partners who have a complaint or concern about possible harassment in connection with incidents they have experienced or of which they are aware are required to report such complaint or concern immediately.  Cintas is prepared to receive complaints about behavior that is perceived as unprofessional or inappropriate regardless of whether the behavior constitutes unlawful harassment.  Partners are encouraged to

---

[11] Since Jackson's employment with Cintas, the policy in the Guide has been revised three times.  (Def. Resp. to Ct. Order ¶ 3 (Clement-Williams Aff. ¶ 3).)  The original version and the three revisions are part of the summary judgment record.  (<u>Id.</u> (Ex. 2).)

report concerns to their supervisor.  If a report to a supervisor is not appropriate, or effective, partners are required to promptly seek the assistance of your General Manager or Human Resources Manager.  You may also write to an officer of the company on a Hot Line Form, or call the Direct Line, which is available 24 hours a day, 7 days a week at 1-800-292-9480.  (More information on the Hot Line Form and The Direct Line is included under "Communication Policy.")

(Id.)

An anti-harassment policy is posted on a bulletin board in the employee break room.  The posted policy, labeled as Corporate Policy #C-138, is typed on 8 ½- x 11-inch paper; the bulletin board contains multiple postings.[12]  (Def. Resp. to Ct. Order ¶ 2 (Doc. No. 62).)  During Jackson's employment, there have been at least six different versions of the "C-138" anti-harassment policy.  (Id. (Def. Exs. 5, 6 & Clement-Williams Aff. ¶ 6).)  Each version of the policy defines sexual harassment and makes clear that Cintas prohibits sexual harassment of its employees.  (Id.)  As to the procedures for reporting harassment, the policies contain an avenue for reporting harassment which permits the victim to bypass making a report to the victim's direct supervisor when the direct supervisor is the harasser.  (Id. (Exs. 5-6).)

Jackson saw the bulletin board in the break room "every day at lunch."  (Pl. Dep. (errata) at 1 (Doc. No. 49)); (Douglas Dep. at 62, 99-100 (Def. Ex. to Doc. No. 16).)  She, however, did not notice the anti-harassment policy on the bulletin board until after she had filed her sexual harassment claim with the Equal Employment Opportunity

---

[12] For example, currently the bulletin board is labeled "Laws & Policies" and contains 22 postings.  (Def. Resp. to Ct. Order (Clement-Williams Aff. ¶ 4 (Doc. No. 62).)

Commission.  (Pl. Aff. at 1 (Ex. 1 to Doc. No. 63).)  Jackson, thus, says that she did not know to whom she could report the harassment and did not know about the 1-800 hotline. (Pl. Dep. at 36, 84, 169-69.)

An issue has arisen as to when Cintas first began posting its policy in the employee break room.  The court permitted Cintas to present additional evidence on this issue,[13] but the answer remains unclear.  Cintas was candid in its response to the court's order.  Cintas "cannot specifically identify the date the Montgomery Facility posted the sexual harassment policy."  (Def. Resp. to Ct. Order at 1 (Doc. No. 62).)  Rather, the best evidence which Cintas has regarding the time frame of the posting of the policy stems from Douglas' declaration.[14]  (Id. (Douglas Decl. (Ex. B).)  Douglas says that she posted

_____

[13] Cintas' original evidentiary filings in support of its motion for summary judgment were incomplete as to when the policy was placed on the bulletin board in the employee break room.  Because of this factual void, the court entered an order on August 25, 2005. (Doc. No. 60.)  In that order, the court concluded that Jackson's deposition testimony, as corrected in her "errata," was ambiguous as to when she first noticed the policy on the bulletin board, i.e., whether she "saw" only the bulletin board "every day" or whether "every day" she also noticed that there was an anti-harassment policy posted on that board.  (Pl. Dep. at 31-32.)  Other evidence in the record added to, rather than clarified, the ambiguity.  (Doc. No. 60); (see, e.g., Douglas Dep. at 61-62, 99-100.)  The court, thus, reopened the summary judgment record, in part, to permit Cintas to supplement the record with evidence concerning (1) the date Cintas' anti-harassment policy was posted on the bulletin board in the employee break room; and (2) the exact wording of the posted anti-harassment policy and other details concerning the physical dimensions of the posted policy.  Cintas responded to the court's order on September 1, 2005.  (Doc. No. 62.)

[14] Addressing Jackson's objection (see Doc. No. 63 at 3), the court observes that Douglas' declaration conforms with 28 U.S.C. § 1746 which governs unsworn declarations made under penalty of perjury.  Declarations may be submitted in lieu of affidavits in federal proceedings.  See Colodny v. Iverson, Yoakum, Papiano & Hatch, 936 F. Supp. 917, 926 n.2 (M.D. Fla. 1996).

Cintas' anti-harassment policy in the employee break room as part of her implementation

of the "Direct Line" training program, but she cannot specifically identify the date when

she conducted this training.[15]  Although unable to recall an exact date, Douglas

remembers that Blakely served as the distribution center manager when she posted the

policy in the employee break room.  (Id. (Douglas Decl. ¶¶ 4-5).)  The record reveals that

Blakely served in this capacity from November 1997 to June 1, 2002.  (Id. (Clement-

Williams Aff. ¶ 9).)

After hiring Angell, Cintas informed him of its various employment policies,

including the prohibition against sexual harassment.  (Def. Resp. to Pl. 1st Interrogs., No.

5.)  Thereafter, Cintas trained Angell and its managers "annually on sexual harassment

and other employment issues."  (Def. Resp. to Pl. 1st Interrogs., No. 5); (Clement-

Williams Dep. at 27); (Holloman Dep. at 32-37); (Douglas Dep. at 10-11); (Angell Dep.

at 13-14).)  Douglas "felt" that Cintas "took [its training] seriously."  (Douglas Dep.

at 10-11, 60-61, 66.)  A portion of the management training includes two video

presentations which encompass training on sexual harassment and are "specifically"

designed for supervisors.  (Def. Resp. to Pl. 1st Interrogs. No. 6); (Douglas Dep. at 10-11,

---

[15]  The Direct Line program encompassed employee training on "unethical and
inappropriate work place conduct."  (Def. Resp. to Ct. Order ¶ 2 (citing Clement-
Williams Aff. ¶ 7) (Doc. No. 62).)  Employees also watched a video and received "pocket
cards that listed numbers for them to call to directly report problems."  (Id.); (see also
Douglas Dep. at 99-100, 132-33.)  Although not required to do so, Douglas incorporated
into her Direct Line presentation "training on generic harassment."  (Id. (Douglas Decl.
¶ 4).)  As part of the harassment training, she posted Cintas' sexual harassment policy and
informed employees where she had posted the policy.  (Id.)

61); (Holloman Dep. at 34-35, 161); (Angell Dep. at 13-14.)  The videos "cover sexual harassment, describe the rights of individuals, and address acceptable and unacceptable conduct."  (Def. Resp. to 1st Interrogs. No. 6.)  Angell received this training in 1997 and each year thereafter.  (Angell Dep. at 13-14); (Pl. Ex. I attached to Angell Dep. & Doc. No. 16)); (Douglas Dep. at 10-11.)

In approximately 2001, Cintas implemented a "division-wide" training program on harassment.  The training is provided to newly-hired employees on their first day of work during the orientation process.  (Clement-Williams Dep. at 25-26); (Def. Resp. to Ct. Order (Clement-Williams Aff. ¶ 8).)  Prior to 2001, Cintas did not offer any specific sexual harassment training for the hourly employees.  (Douglas Dep. at 60-63, 67); (Def. Resp. to Ct. Order ¶ 2 (citing Clement-Williams Aff. ¶ 2) (Doc. No. 62).)  Jackson, however, did not receive the harassment training or the Direct Line training which Douglas conducted, and she does not have a pocket card.  She does not expressly assert that the Direct Line training did not occur, as she remarks that she "could have been out that day."  (Pl. Dep. at 206-08, 225-26.)  No management employee ever discussed with Jackson sexual harassment or how to report it.  (Pl. Aff. at 1 (attached as exhibit to Doc. No. 63).)

According to Clement-Williams, Cintas has a standard investigation procedure in sexual harassment cases.  (Clement-Williams Dep. at 35.)  The procedure entails obtaining the "specifics" of the allegations and interviewing all employees who "may have knowledge of what happened."  (Id.); (see also Holloman Dep. at 40.)

D.  Jackson's Claims

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("E.E.O.C."), Jackson timely filed this lawsuit on November 26, 2003.[16] (Doc. No. 1.)  Jackson's Complaint contains six counts as follows:  (1) a sexual harassment claim brought pursuant to Title VII (id. ¶¶ 23-31); (2) a Title VII retaliation claim (id. ¶¶ 32-36); (3) a state law claim for intentional infliction of emotional distress (id. ¶¶ 37-42); (4) a state law claim for breach of contract (id. ¶¶ 43-49); (5) a state law claim for breach of implied covenant of good faith and fair dealing (id. ¶¶ 50-53); and (6) a state law claim for negligent hiring, training, supervision and retention (id. ¶¶ 54-60).  Jackson seeks declaratory and injunctive relief, compensatory and punitive damages, mental anguish damages, costs and attorneys' fees.  (Id. ¶ 8.)

On January 6, 2005, Jackson moved to dismiss her Title VII retaliation claim, and the court granted that motion on March 7, 2005.  (Doc. Nos. 20, 32.)  Cintas now moves for summary judgment on the remaining five claims in the Complaint.

---

[16] Cintas has not challenged Jackson's averment that she timely fulfilled the jurisdictional requirements for filing a Title VII lawsuit, (see Compl. ¶¶ 1–13 (Doc. No. 1)), and the evidence supports Jackson's contention.  (See Pl. E.E.O.C. charge & E.E.O.C. Not. of Right to Sue (attached to Compl as Exs. 1-2)); see also Forehand v. Florida State Hosp. at Chattahoochee, 89 F.3d 1562, 1567 (11th Cir. 1996) ("Before instituting a Title VII action in federal district court, a private plaintiff must file an E.E.O.C. complaint against the discriminating party and receive statutory notice from the E.E.O.C. of his or her right to sue the respondent named in the charge.").

## V.  DISCUSSION

Jackson claims that the sexual harassment she endured while employed by Cintas created a hostile work environment in violation of Title VII.  Cintas argues that Jackson cannot establish that a hostile work environment existed, but that, even assuming the existence thereof, Cintas is not liable based on the affirmative defense set out in Burlington Industries v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

A Title VII hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  In order to establish that she was harassed so as to create a hostile work environment, Jackson must prove:

> (1) that . . . she belongs to a protected group;
> (2) that [she] has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;
> (3) that the harassment [was] based on [her] sex . . .;
> (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and
> (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

For purposes of summary judgment, Cintas has not disputed elements one, two and three.  (Def. Br. at 13 (Doc. No. 47).)  The fourth and fifth elements, however, are contested and, thus, require discussion.

### A.  Severe or Pervasive Harassment

Jackson must establish that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of her employment.  The severe or pervasive element "includes a subjective and an objective component."  Mendoza, 195 F.3d at 1246.

The subjective component focuses on the employee's perception.  See id.  The Mendoza court explained that "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable."  Id.

Here, the fact that Jackson continues to work for Cintas does not diminish her ability to demonstrate the subjective component.  See, e.g., Davis v. United States Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998) (under the subjective component, the law does not "require that she quit or want to quit the employment in question").  Jackson has stated that, as a result of the harassment, she has suffered extreme stress and loss of sleep. (Pl. E.E.O.C. Aff. ¶ 11); (Pl. Resp. at 9 (Doc. No. 27).)  Furthermore, Jackson says that the stress caused her to become so distracted that she injured her hand in a conveyor belt at work and was at fault in a car accident in which she suffered severe physical injuries.

23

(Pl. Dep. at 281-82, 296-97, 349-52); (Pl. Resp. at 8 (Doc. No. 27); (Compl. ¶ 22 (Doc. No. 1).)

The court finds that Jackson's evidence is sufficient to warrant jury consideration of whether Jackson subjectively perceived the harassment as sufficiently severe or pervasive and of whether her perception was objectively reasonable.  See Davis, 142 F.3d at 1341-42 (evidence sufficient to establish subjective component where plaintiff offered deposition testimony that actions of harasser "made her 'more and more stressed out and pretty cracked,' . . . and feel '[t]errible,' . . ., that she 'hated' the behavior, . . . was 'pretty shocked,' . . . and that she 'just wanted to avoid the whole situation'"); Smith v. Norwest Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997) (fact that plaintiff was "humiliated" and "upset" by her supervisor's hostile remarks was adequate evidence to satisfy subjective component).

The objective component requires Jackson to show that the harassment she suffered would cause a reasonable person in her position, considering all the circumstances, to find the working environment to be hostile or abusive.  See Mendoza, 195 F.3d at 1246.  The court must consider the following factors in its objective analysis of whether the alleged harassment "altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."

Id. (citations omitted).  The objective analysis considers the totality of the circumstances in determining the severity and pervasiveness of the alleged harassing conduct.  Id.

In Mendoza, some five months after she was hired, the plaintiff alleged that her supervisor began to sexually harass her.  The court held that the following conduct, which spanned nearly eleven months, was not sufficiently severe or pervasive to alter the plaintiff's terms or conditions of employment: one statement by a supervisor that he was "getting fired up"; one incident when the supervisor rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; two occasions where the supervisor made "sniffing" sounds while looking at the plaintiff's groin; one incident where he made a similar sniffing sound, but did not look at her groin; and testimony that the supervisor followed the plaintiff and stared at her (unaccompanied, though, by any evidence that the following and staring amounted to "stalking," "leering," intimidation or threats).  Id. at 1242, 1247, 1249.

The severity of Angell's conduct is illustrated by its overtly sexual nature.  Almost immediately upon Jackson's hire, Angell made clear his management style when, as Jackson's direct supervisor, Angell told her that "going down" on him would "get[] [her] high places" at Cintas.  (Pl. Dep. at 43-47).)  In addition to pronouncing that oral sex would result in company advancement, in the days to follow, he told Jackson that she sexually aroused him and illustrated his comment by grabbing his genitals.  He also "invited" Jackson to have sex with him in the conference room.  (Pl. Dep. at 57, 72-77, 94-96.)  The court finds that these obscene epithets and actions which Jackson endured

25

from Angell are quite different from the behavior at issue in <u>Mendoza</u>, where the court questioned whether the harasser's conduct included the "necessary sexual or other gender-related connotations to be actionable sex discrimination."  195 F.3d at 1247.

The severity in this case is magnified by Angell's physical contact with Jackson. Twice, Angell touched Jackson's breast.  While Cintas remarks that the contact lasted only a "millisecond" or "second" (<u>see</u> Def. Br. at 4 (Doc. No. 47) (citing Pl. Dep.)), it is the hasty and trite manner – with a "smirk" and a cheeky comment (i.e., "Ooh I touched a tit") – which inferentially bolsters a finding that Angell held a belief that his managerial power bestowed upon him the right to sexually engage his subordinates whenever he desired.  (<u>Id.</u> at 87-88, 91, 123.)  Unlike the brush against the hip in <u>Mendoza</u>, the court finds that the manner in which Angell touched Jackson's breast leaves no ambiguity that the touching was intentional, planned, and sexually motivated.  At the very least, the court finds that Angell's touching could be viewed as physically threatening and humiliating. <u>See</u> <u>Smith v. Auburn Univ.</u>, 201 F. Supp.2d 1216, 1225 (M.D. Ala. 2002).

Moreover, the court finds that the conduct in this case is more frequent than that in <u>Mendoza</u>.  <u>Cf.</u> <u>Mendoza</u>, 195 F.3d at 1249 (holding that "a single instance of slight physical contact, one arguably inappropriate statement, and three instances of [the supervisor] making a sniffing sound" were not frequent).  Although the harassment ceased for an approximate two-year period, partly because Angell moved to Chicago, when he returned, *albeit* not immediately upon his return, he resumed the harassment after being promoted to the highest position in the Montgomery distribution center.  At

this time, the sexual overtures increased in frequency.  During the course of a year, from approximately March 2001 to March 2002, every single day that Jackson was at work, Angell would tell her that he wanted to lock the door and have sex with her on the table in the conference room.  (Pl. Dep. at 57, 72-77.)  He would express this lewd invitation not once a day, but "several" times a day.  (Id. at 73, 75.)  Adding fuel to this fire, Angell told Jackson on different occasions that he was "horny" and could "go all night."  (Id. at 76, 79-81, 123-24.)  Overall, the harassment Jackson endured spanned a time period longer than the duration of the harassment suffered by the Mendoza plaintiff.  Significantly, particularly after March 2001, the incidents did not sporadically occur but, to the contrary, were daily occurrences.

Finally, the court finds that a jury could conclude that the conduct of Angell unreasonably interfered with Jackson's job performance by promoting a work environment where she was "fair game" for uninviting touching, offensive propositions, and lewd comments.  Faragher v. City of Boca Raton, 864 F. Supp. 1552, 1562 (S.D. Fla. 1994), aff'd, 524 U.S. 775 (1998).

Based on the foregoing, the court finds that, under the totality of the circumstances, Jackson has created a genuine issue of material fact as to whether the conduct of Angell was sufficiently severe or pervasive to alter the terms or conditions of her employment.  With that said, the court is cognizant that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  Faragher, 524 U.S. at 788.  The court, however, finds that Jackson has

27

satisfied the "baseline" for surviving summary judgment.  Mendoza, 195 F.3d at 1244

(observing that judges "police the baseline" when they address hostile work environment

claims at the summary judgment stage).

Jackson, however, also must establish Cintas' responsibility for the sexual

misconduct of Angell.  It is to this issue that the court now turns.


B.  Cintas' Liability for Angell's Harassment and
the Ellerth/Faragher Affirmative Defense

Title VII protects employees from hostile workplace environments created by both

supervisors and co-workers; however, the test for employer liability differs depending

upon whether the harasser is a co-employee or a supervisor.  See Ellerth, 524 U.S. 742;

Faragher, 524 U.S. 775.  Here, Jackson alleges harassment by a supervisor.[17]

The Supreme Court has distinguished between hostile work environment cases in

which the supervisor takes a tangible employment action against the subordinate and

those in which the supervisor does not.  Ellerth, 524 U.S. at 760-65; Faragher, 524 U.S.

at 807.  "The employer will be strictly liable for the hostile environment if the supervisor

takes tangible employment action against the victim."  Miller v. Kenworth of Dothan,

Inc., 277 F.3d 1269, 1278 (11th Cir. 2002) (quoting Faragher, 524 U.S. at 807).  In the

---

[17] It is not disputed that Angell exercised "immediate (or successively higher)
authority" over Jackson so as to accord Angell Title VII supervisory status.  Miller v.
Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002); see also Dinkins v.
Charoen Pokphand, 133 F. Supp.2d 1254, 1266-67 (M.D. Ala. 2001) (defining the Title
VII supervisor).

absence of a tangible employment action, in cases of workplace harassment by supervisors, the employer may raise a two-pronged affirmative defense to employer liability.  This defense requires proof "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 807.  For a defendant to prevail on this defense, "'[b]oth elements must be satisfied,'" and "'the defendant bears the burden of proof on both elements.'"  Bryant v. School Bd. of Miami Dade County, ___ F.3d ___, 2005 WL 1669596 (11th Cir. 2005) (quoting Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001)).

Jackson concedes that she has not suffered a tangible employment action, thereby entitling Cintas to assert the affirmative defense outlined in Ellerth and Faragher.  (Pl. Resp. at 11 (Doc. No. 27).)  Cintas argues that it is not liable for any sexual harassment by Angell because it has met its burden under both prongs of the Ellerth/Faragher defense.  (Def. Br. at 14 (Doc. No. 47).)

To succeed on summary judgment, Cintas must demonstrate that there are no material factual disputes in favor of Jackson on either prong of its defense.  Cintas argues that it widely disseminated an anti-harassment policy with specific reporting procedures and that Jackson was dilatory in complaining of sexual harassment, but that it responded promptly when she finally did complain.  As a result, Cintas argues, it cannot be held

29

vicariously liable for Angell's harassment.  As discussed below, however, Jackson paints a different picture from the evidence.

The first element of the affirmative defense comprises two parts – "reasonable care to prevent sexual harassment" and "reasonable care to correct sexual harassment," Bryant, 2005 WL1669596, *2.  The court first examines the preventive aspect of the first element.

The existence of a formal anti-harassment policy is not an absolute prerequisite to satisfying the preventive component of the first element of the Ellerth/Faragher affirmative defense; at the same time, a formal policy does not automatically establish the preventive prong.  See Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp.2d 1237, 1251 (M.D. Ala. 2001).  To be deemed sufficiently preventive, an anti-harassment policy must be "comprehensive, well-known to employees, vigorously enforced, and provide[] alternate avenues of redress."  Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).  In Walton v. Johnson & Johnson Serv., Inc., the Eleventh Circuit held that an employer could demonstrate that it exercised reasonable care to prevent the sexual harassment through promulgation and dissemination of an anti-harassment policy with complaint procedures which "adequately address[] Title VII's deterrent purpose."  347 F.3d 1272, 1286 (11th Cir. 2003).  "At a minimum," the complaint procedure must be "'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor.'"  Id. (quoting Faragher, 524 U.S. at 806 (alteration in original) (citations omitted)).

Moreover, in <u>Madray v. Publix Supermarkets, Inc.</u>, the Eleventh Circuit held that the employer's sexual harassment policy "met the minimal requirements for the <u>Faragher</u> defense." 208 F.3d 1290, 1299 (11th Cir. 2000). "[T]he procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives." <u>Id.</u>

Here, multiple versions of Cintas' anti-harassment policy have been submitted. (<u>See</u> Def. Resp. to Ct. Order at 2 (Doc. No. 62).) Jackson focuses not on the complaint procedures contained in the various versions of the policy, but rather on Cintas' dissemination, or rather lack thereof, of the policy and her corresponding lack of notice of the complaint procedures therein. The court, thus, assumes, without deciding, for purposes of the present analysis, that the versions of the anti-harassment policy contained in the Partner Reference Guide and posted in the employee break room contain the essential ingredients of an effective complaint procedure, in part, because each provides an alternative, and presumably accessible, means to report harassment where the harasser is the supervisor. (<u>See</u> Policy (Def. Ex. 16 to Doc. No. 16)); (Def. Resp. to Ct. Order at 2 (Exs. 2, 5-6).)

An anti-harassment policy which contains an effective complaint procedure also must be disseminated or publicized to be deemed sufficiently preventive. As stated in <u>Walton</u>, "'[d]issemination of an employer's anti-harassment policy [is] fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment.'"

31

347 F.3d at 1286 (quoting <u>Madray</u>, 208 F.3d at 1298); <u>Frederick</u>, 246 F.3d at 1314-15

("in order to establish that it took reasonable steps to prevent harassment, [the employer]

was required to show that its sexual harassment policy was effectively published, that it

contained reasonable complaint procedures, and that it contained no other fatal defect");

<u>cf.</u> <u>Faragher</u>, 524 U.S. at 808 (holding as a matter of law that the employer could not

satisfy the first prong of the affirmative defense, notwithstanding the existence of a sexual

harassment policy, because it "had entirely failed to disseminate its policy against sexual

harassment among the beach employees and . . . made no attempt to keep track of the

conduct of [its] supervisors").

Dissemination can occur through a well-publicized employee handbook which

contains an anti-harassment policy.  See <u>Madray</u>, 208 F.3d at 1294, 1298.  Additionally,

some district courts have concluded that "simply posting one's harassment policy on a

bulletin board in a central location is enough to establish a reasonable dissemination of

the policy." <u>Samedi v. Miami-Dade County</u>, 206 F. Supp.2d 1213, 1220 (S.D. Fla. 2002)

(citing <u>Savino v. C.P. Hall Co.</u>, 199 F.3d 925, 932-33 (7th Cir. 1999), <u>Phillips v. Taco Bell</u>

<u>Corp.</u>, 83 F. Supp.2d 1029, 1033 (E.D. Mo. 2000), <u>Reynolds v. Golden Corral Corp.</u>, 106

F. Supp.2d 1243 (M.D. Ala. 1999), <u>aff'd</u>, 213 F.3d 1344 (11th Cir. 2000), and <u>Corcoran v.</u>

<u>Shoney's Colonial, Inc.</u>, 24 F. Supp.2d 601, 606 (W.D. Va. 1998)); <u>see</u> <u>also</u> <u>Kopczyk v.</u>

<u>Amphenol Corp.</u>, No. 02-C-7132, 2003 WL 22425021, *4 (N.D. Ill. 2003) (finding on

summary judgment that sexual harassment policy was effectively disseminated for

purposes of first prong of affirmative defense, where policy was posted on a bulletin board in the employee lunchroom, an area open to everyone).

Cintas contends that it effectively disseminated its anti-harassment policy by publishing it in its Partner Reference Guide and by posting it in the employee break room. (Def. Br. at 14 (Doc. No. 47).) Jackson argues that these methods of dissemination were not effective. The Partner Reference Guide was in place when Jackson was hired. Jackson, however, emphasizes that it was not until January 9, 2002, more than four years after she began working at Cintas, that she received the Guide and that by that point she had endured substantial harassment from Angell. (Pl. Resp. at 18 (Doc. No. 27).) She further says that no management employee ever discussed sexual harassment with her or told her how to report it. (Pl. Aff. at 1 (Ex. 1 to Doc. No. 63).) Moreover, regarding Cintas' posting of the policy, Jackson points out that Cintas has not been able to establish the date it posted the policy in the employee break room. (Pl. Br. at 1 (Doc. No. 63).) She also suggests that, regardless of when the policy was posted, she cannot be charged with notice of the policy's contents because she did not see the policy posted in the break room until after she lodged her complaint against Angell in 2002. (Pl. Aff. at 1 (Ex. 1 to Doc. No. 63).) Furthermore, after receiving the Guide in January 2002, Jackson remained unaware of the contents of Cintas' anti-harassment policy because she says that she did not read the Guide. (Pl. Dep. at 26.) Finally, as a partner (as opposed to a manager), she asserts that she never received training on Cintas' anti-harassment policy.

She, therefore, argues that she had no knowledge of the sexual harassment complaint procedures during the time period that Angell harassed her.

Ultimately, the court is persuaded that there are sufficient material factual disputes which render resolution of the affirmative defense inappropriate on summary judgment, and the court will explain its reasoning below.  Initially, though, the court feels compelled to address Jackson's implication that she can rely upon her failure to see the policy on the bulletin board or read it once she received the Guide as legal justification for her lack of awareness of Cintas' procedures for reporting sexual harassment.

Effective dissemination or publication through posting of a policy or distribution of an employee handbook which contains an anti-harassment policy is not contingent upon whether the employee reads the policy.  In Shaw v. AutoZone, Inc., the Seventh Circuit held that the employer proved that it had exercised reasonable care to prevent any sexually harassing behavior where the employer adopted an anti-harassment policy and distributed the policy to all employees.  See 180 F.3d 806, 811 (7th Cir. 1999).  The court concluded that it was "irrelevant" that the plaintiff said she had never seen the sexual harassment policy "because it was undisputed that she had received a copy of the policy and that she was required as a condition of her employment to read and comply with both the policy and the other terms contained in the Employee Handbook."  Id.  Furthermore, the plaintiff had signed an acknowledgment form stating, "I understand it is my responsibility to read and learn the policies and procedures" in the employee handbook.  Id.  The Seventh Circuit, thus, held that, under these circumstances, even if the plaintiff

did not have actual knowledge of the policy, she had constructive knowledge of it.  See id.; see McDaniel v. Merlin Corp., No. Civ. A. 1: 01CV2992JEC, 2003 WL 21685622, *10 (N.D. Ga. June 26, 2003) (finding that plaintiff acknowledged her obligation to report harassment in accordance with the employer's policy based upon her signed acknowledgment that it was her responsibility to read and comply with the handbook containing the employer's anti-harassment policy).

        Also, in Reynolds, the court concluded that the employer "exercised reasonable care to ensure that the employees were aware of complaint procedures" because it posted its policy "prominently" in an area where the employee worked.  106 F. Supp.2d at 1248-51.  The court reasoned that the employer "need not establish that every employee read the posted policy to establish that it exercised reasonable efforts to communicate procedure."  Id.; see also Samedi, 206 F. Supp.2d at 1220 (rejecting plaintiff's contention that her employer's publication by conspicuous posting was ineffective because she never "saw the policy posted"; "it is irrelevant whether the [p]laintiff actually saw the policy so long as it was posted in a reasonable place") (citing Reynolds, 106 F. Supp.2d at 1243) (internal citations omitted).

        Here, the break room is an area admittedly used by Jackson on a daily basis and, thus, is accessible to her.  (Pl. Dep. at 31.)  There also is evidence that the bulletin board was in a conspicuous location because Jackson admits that she saw the bulletin board in the break room "every day during lunch."  (Pl. Aff. at 1 (Ex. 1 to Doc. No. 63).)  Based on the foregoing line of cases, these facts demonstrate that, as to the posting of the policy

in the break room, Jackson cannot validly predicate her ignorance of Cintas' policy on her failure to notice the policy once it was posted.  The same holds true for her failure to read the Guide, particularly given that she signed an acknowledgment that she had "reviewed the Cintas Partner Reference Guide."  (Def. Ex. 15 to Pl. Dep. (Doc. No. 16); (Pl. Dep. at 24-26); see Shaw, 180 F.3d at 811-13.  Jackson chose not to read the policy, but she did so at her own peril.

The facts, however, are indeterminate as to when the anti-harassment policy was posted in the employee break room, and, thus, one issue is whether the lack of clarity as to the date of posting precludes the entry of summary judgment in Cintas' favor on the preventive prong of the Ellerth/Faragher affirmative defense.  Cintas argues that the ambiguity as to the date of posting is not material to resolution of its summary judgment motion.  Specifically, Cintas asserts that, "[a]lthough the specific date of the posting is uncertain, it is clear that the posting existed before the commencement of the bulk of the harassment in question."  (Def. Resp. to Ct. Order at 2 (Doc. No. 62).)  Citing Jackson's deposition testimony, Cintas reconstructs that the harassment commenced between February 1998 and June 1998, ceased in June 1998, when Angell left the Montgomery distribution center, and did not resume until after March 2001, the month that Angell obtained a promotion to general manager at the Montgomery distribution center.  (Id.); (see also Def. Br. at 2 (Doc. No. 47).)  At most, Cintas contends that "only the February to June 1998 conduct might have occurred at a time when the policy was not posted" in the employee break room and that, therefore, "Jackson has no credible basis to maintain

36

that she lacked knowledge of the avenues available to her to report the alleged harassment Angell engaged in beginning in June 2001." (Def. Resp. to Ct. Order at 2 (Doc. No. 62).)

Cintas suggests that the analysis of the preventive prong of the affirmative defense should be divided into two distinct time periods, with the date of posting constituting the dividing line. Cintas asserts that, at the latest, on June 1, 2001, it disseminated its policy to Jackson by posting it in the employee break room.[18] Cintas asks the court to find that the posting constitutes effective dissemination and to find that, after June 1, 2001, Jackson was on constructive notice of the policy's procedures and had a duty to timely make a complaint in accordance with the policy's reporting mechanisms. Because Jackson made no effort to report Angell's harassment until more than nine months later, in late March 2002, Cintas argues that she did not act reasonably and that, therefore, under Faragher Cintas avoids liability for all post-June 1, 2001 harassment. At the very least, Cintas contends that Jackson acted unreasonably in failing to promptly report the harassment after receiving the Guide in January 2002. Furthermore, as to the alleged harassment occurring between February 1998 and June 1998, Cintas says that Jackson cannot avoid application of the affirmative defense because she testified that "someone told her when Cintas hired her in February 1998 that it did not tolerate sexual

_____

[18] As stated, Douglas recalls only that she posted the policy in the break room some time between November 1997, and June 1, 2001. (See Def. Resp. to Ct. Order (Doc. No. 62) & Douglas Decl. attached thereto).) The court agrees with Cintas that, viewing the evidence in the light most favorable to Jackson, the court must presume that the date of posting was June 1, 2001.

harassment." (Id. at 2.)  Thus, "at a minimum, she was on notice that she could report the alleged harassment to this individual." (Id. at 2-3.)

The court, however, finds that Cintas' arguments conflate the first prong of Faragher – whether Cintas acted reasonably to prevent the sexual harassment – with the second prong – whether Jackson unreasonably failed to take advantage of any preventive opportunities.  Under a constructive notice theory, as discussed *supra*, the court agrees with Cintas that Jackson is not excused from failing to read the anti-harassment policy in the Guide when she received the Guide in January 2002 or on the bulletin board when it was posted on June 1, 2001, so long as the posting was conspicuous and contained effective reporting procedures.  Whether Jackson acted unreasonably in failing to report the harassment after being constructively on notice of Cintas' anti-harassment policy, though, is part of the second prong and involves a separate inquiry from whether, in the first instance, Cintas acted reasonably to prevent the sexual harassment.  Cf. Walton, 347 F.3d at 1289-91 (holding that employee's three-month delay in reporting her supervisor's repeated acts of sexual harassment, including a rape, was sufficient to demonstrate *second prong* of Ellerth/Faragher defense).

In Harrison v. Eddy Potash, Inc., which was on remand for further consideration in light of Faragher, the Tenth Circuit held that the employer was not entitled to judgment as a matter of law on the Ellerth/Faragher defense without reaching the second prong of that defense, i.e., the issue of the plaintiff's reasonableness.  See 158 F.3d 1371, 1374

& 1377 (10th Cir. 1998).  As to the first prong, the court held that the evidence raised "serious questions" concerning the reasonableness of the employer's efforts to prevent sexual harassment in the workplace.  Id. at 1377.  The Tenth Circuit relied upon the fact that the employer did not take any steps to apprize the plaintiff of its anti-harassment policy prior to the harassment.  Specifically, citing its earlier opinion, the court observed that, "although [the employer] had in place an official policy against sexual harassment, evidence indicated [that the employee] had not been made aware of that policy prior to [the supervisor's] harassment of her."  Id. at 1377 (citing Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1442 (10th Cir. 1997)).

The facts here are similar.  Jackson commenced employment with Cintas on February 18, 1998, (see Pl. "Employment Status" form (Ex. to Pl. Dep.)), yet, construing all facts in her favor, Cintas did not take any steps to notify Jackson that it had in place an anti-harassment policy until June 1, 2001, when it posted the policy in the break room.  It was not until some seven months later, in January 2002, when Cintas gave a Partner Reference Guide to Jackson, that it provided Jackson with her own copy of the anti-harassment policy.  Prior to the posting on June 1, 2001, which undisputedly occurred subsequent to some incidents of harassment by Angell, the evidence establishes that Jackson did not have either actual or constructive notice of Cintas' anti-harassment policy.

Cintas did not conduct any form of anti-harassment training for hourly employees until several years after Jackson had commenced employment.  Even then, Jackson was

39

not offered the training and has never received any training.[19]  Moreover, no supervisor at

Cintas ever informed Jackson of Cintas' procedures for reporting sexual harassment or

told her that there was anti-harassment policy in place at Cintas, (Pl. Aff. at 1 (Ex. 1 to

Doc. No. 63)), despite the existence of corporate policy directing managers to train

partners on the policy.  (See Corporate Memorandum, dated Oct. 7, 1993 (Ex. 1 to

Clement-Williams Aff. at Doc. No. 63).)  Under the preventive prong of the first element

of the affirmative defense, the court finds that whether Cintas' delay in disseminating its

policy to Jackson – through the posting on June 1, 2001, and the distribution of the Guide

on January 9, 2002 – was reasonable raises a question of fact for the jury.

      Stated a different way, the court finds that ample factual disputes exist as to the

reasonableness of Cintas' dissemination of its anti-harassment policy to Jackson.  There

are factual disputes as to when Jackson personally received a copy of the anti-harassment

---

    [19] Cintas points out that, to succeed on the first prong of the affirmative defense, an employer is not required to implement an official, training program on workplace harassment.  (Def. Br. at 15 n.11 (Doc. No. 47)) (citing Jones v. USA Petroleum Corp., 20 F. Supp.2d 1379, 1386 (S. D. Ga. 1998).)  Cintas, though, has referred to a training session for partners which included discussion of Cintas' anti-harassment policy.  (Id. at 14-15.)  To the extent that Cintas relies on this training session as evidence that Cintas informed Jackson of its anti-harassment policy, Jackson has testified that she was not a participant in this training session and never received any other training on the policy.  (See, e.g., Pl. Dep. at 16, 226-26.)  Jackson's testimony provides an additional evidentiary dispute as to whether Cintas adequately notified her of its policy and the policy's reporting procedures.  Cf. P. v. Delta Air Lines, Inc., 102 F. Supp.2d 132, 140 (E.D.N.Y. 2000) (factors relevant to determining whether an employer has provided a reasonable avenue for complaint include, inter alia, whether the policy is seriously enforced, whether employees are informed how to report sexual harassment, and whether the policy is effectively communicated to employees).  Moreover, at this juncture, it is appropriate to mention that the value of sexual harassment training to all employees as evidence that an employer has taken prophylactic action should not be overlooked.  At least two district courts have precluded an award of punitive damages where the employer's sexual harassment training program was deemed evidence of employer good faith.  See Hull v. APCOA/Standard Parking Corp., No. 99-C-2832, 2000 WL 198881, at *15 (N.D. Ill. 2000); Woodward v. Ameritech Mobile Communications, Inc., No. 98-0744, 2000 WL 680415, at *16 (S.D. Ind. 2000).

policy, whether she received any training or other oral notice of the policy, and when the policy was posted in the employee break room.  Although Cintas engaged in various efforts to distribute its sexual harassment policy after Jackson was hired, for example, through its new employee orientation program, the evidence indicates that these efforts did not extend to Jackson.  Consequently, based on the foregoing, the court finds that there is sufficient evidence raising issues of material fact as to whether or not Cintas exercised reasonable care to prevent the sexual harassment.

The court also has considered other of Cintas' arguments.  For instance, Cintas points to the fact that Jackson has testified that she knew that Angell's conduct constituted sexual harassment and has admitted that, at the inception of her employment, a manager told her that Cintas does not tolerate sexual harassment.  (See Def. Resp. to Ct. Order at 2-3 (Doc. No. 62); (Def. Br. at 6 (Doc. No. 47 at 6).)  Cintas asserts that, at the very least, because Jackson understood her right to be free from sexual harassment, she could have reported Angell's conduct to the manager who told her about Cintas' prohibition against such conduct.  (See Def. Resp. to Ct. Order at 2-3 (Doc. No. 62).)  Moreover, Cintas asserts that Jackson did not report the sexual harassment to Holloman during his September 2001 visit to the Montgomery distribution center, notwithstanding his general inquiries as to whether anything was troubling her.  (Def. Br. at 7-8 (Doc. No. 47).)  It may be that these arguments are relevant to the issue of whether, under the second element of the affirmative defense, Jackson unreasonably failed to "avoid harm,"

41

Faragher, 524 U.S. at 807, but the court is not persuaded that Cintas' contentions warrant the grant of summary judgment on the first prong of the affirmative defense.

It does not necessarily follow that, because Jackson knew that sexual harassment violated the law, she also knew of the specific measures Cintas had adopted to prevent sexual harassment. In other words, the court finds that Jackson's general awareness of her right under the law to be free from sexual harassment in the workplace does not vitiate Cintas' obligations of informing her of the procedures Cintas has in place for reporting sexual harassment.

Additionally, the court has doubts whether Cintas qualifies as a "small" employer,[20] such that it could satisfy its burden to exercise reasonable care to prevent harassment through such informal means as a general verbal assurance from a supervisory employee that Cintas does not tolerate harassment. See Faragher, 524 U.S. at 808 ("Unlike the employer of a small workforce, who might expect that sufficient care to prevent tortious behavior could be exercised informally. . . ."); EEOC Policy Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, EEOC Notice No. 915.002 (June 18, 1999) ("It may not be necessary for an employer of a small workforce to implement . . . [a] formal complaint process. . . . If it puts into place an effective, informal mechanism to prevent and correct harassment, a small employer could

_____

[20] Cintas' website proclaims that it "operates 351 facilities in the U.S. and Canada, including 14 manufacturing plants and seven distribution centers that employ approximately 30,000." See www.cintas.com/company/corporate_profile.

satisfy the first prong of the affirmative defense to a claim of harassment.").  Finally, notwithstanding Holloman's indication in September 2001 that he may have been receptive to Jackson's concerns, Holloman did not expressly inform Jackson of Cintas' anti-harassment policy or otherwise mention sexual harassment when speaking to Jackson that day.  Although Holloman's actions may have reaffirmed Cintas' generic open door policy, (see Douglas Dep. at 100 (Def. Ex. 3 to Doc. No. 16)), the court finds that Holloman's general inquiries of Jackson are insufficient to prove as a matter of law that Cintas acted reasonably to prevent sexual harassment.  Cf. Robles v. Cox & Co., Inc., 154 F. Supp.2d 795, 804 (S.D.N.Y. 2001) (An open door "policy which does not specifically address sexual harassment does not, on its own, provide sufficient evidence of reasonable care for a grant of summary judgment.").

   Accordingly, because Cintas has not demonstrated as a matter of law that it took reasonable care to prevent the sexual harassment, there are triable issues of fact as to whether Cintas is insulated from liability under Ellerth/Faragher.  Accordingly, the court finds that Cintas has not established that it is entitled to summary judgment based on the Ellerth/Faragher affirmative defense.  The court, therefore, need not, and declines to, decide whether Cintas promptly corrected the harassment once Jackson reported it or whether, under the second prong of the affirmative defense Jackson's delay in reporting the alleged harassment was reasonable given her assertion of fear.  All matters pertaining to the affirmative defense are appropriately left for determination by the jury.  See Soto v. John Morrell & Co., 285 F. Supp.2d 1146, 1166 (N.D. Iowa 2003).

C.  <u>Supplemental State Law Claims</u>

Cintas also moves for summary judgment on Jackson's state law claims for intentional infliction of emotional distress (Compl. ¶¶ 37-42 (Doc. No. 1)), breach of contract (<u>id.</u> ¶¶ 43-49), breach of implied covenant of good faith and fair dealing (<u>id.</u> ¶¶ 50-53), and negligent hiring, training, supervision and retention.  (<u>Id.</u> ¶¶ 54-60).  As to each of the state law claims, Cintas has articulated specific grounds and cited evidence in support of its motion for summary judgment.  ((Def. Br. at 26-28 (Doc. No. 47).)  Jackson responds in cursory fashion that "the evidence abounds" to support "a prima fascia case for emotional distress, negligent hiring, training, supervision and retention."  (Doc. No. 27 at 27.)  Her answer to Cintas' argument pertaining to the breach-of-contract claim is equally terse.  (<u>See</u> <u>id.</u>)

The court finds that the entry of summary judgment in favor of Cintas on the state law claims is appropriate based upon Jackson's inadequate response to Cintas' arguments. <u>See</u> <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995) (observing that court is under no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments"); <u>Burnette v. Northside Hosp.</u>, 342 F. Supp.2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party.").  Additionally, the court finds that Cintas is entitled to summary judgment based upon the substantive reasons set out below.

44

*1.  Intentional infliction of emotional distress*

Jackson predicates her claim of intentional infliction of emotional distress on Angell's conduct and seeks to hold Cintas vicariously liable on the theory that Cintas ratified the sexual harassment she endured at the hands of Angell.  (Compl. ¶ 40 (Doc. No. 1).)  Cintas argues that Angell's alleged conduct lacks the severity necessary to survive summary judgment.  ((Def. Br. at 28 n.16 (Doc. No. 47)).)  Additionally, Cintas argues, that assuming *arguendo* a viable underlying tort, it did not ratify Angell's conduct because, when it obtained actual notice of Jackson's accusations against Angell, it swiftly investigated the allegations, and the harassment ceased.  (Id. at 27.)

In Alabama, the law on the tort of outrage – or intentional infliction of emotional distress – requires a defendant's conduct to be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[21]  Barrett v. Farmers & Merchs. Bank of Piedmont, 451 So. 2d 257, 263 (Ala. 1984) (citations omitted).  The existence of a hostile work environment sufficient to support a Title VII claim does not necessarily equate a finding of outrageous conduct so as to support a claim for intentional infliction of emotional distress.  See Durham v. Philippou, 968 F. Supp. 648, 660 (M.D. Ala. 1997) (finding that the sexual harassment which created jury issue on plaintiff's Title

---

[21] The court notes that the tort of outrage and the tort of intentional infliction of emotional distress are two different names for the same tort.  See *Ex Parte* Crawford & Co., 693 So. 2d 458, 460 (Ala. 1997); Rice v. United Ins. Co. of America, 465 So. 2d 1100, 1101 (Ala. 1984).

VII hostile work environment claim was insufficient to survive summary judgment on tort of outrage).  A claim of outrage, however, was found actionable based upon workplace sexual harassment in Busby v. Truswal Systems Corporation, 551 So. 2d 322 (Ala. 1989).

The court need not decide whether this case presents facts comparable to Busby. The existence of an actionable claim for outrage is but one hurdle which Jackson must overcome.  Additionally, in order to hold Cintas liable for the intentional tort of its agent, Angell, Jackson "must offer evidence (1) that the agent's wrongful acts were committed in the line and scope of the agent's employment; or (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts."  Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992).

The court agrees with Cintas that Jackson has not presented evidence of ratification so as to hold Cintas liable for the actions of Angell.

To show that Cintas ratified Angell's conduct, Jackson must demonstrate: "(1) [that her employer] had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation."  Potts, 604 So. 2d at 400; see also Mills v. Wex-Tex Indus., Inc., 991 F. Supp. 1370, 1386-87 (M.D. Ala. 1997).

In *Ex Parte* Atmore Community Hospital, there was substantial evidence that a supervisor's sexual harassment of the plaintiff amounted to a battery and an invasion of privacy.  See 719 So. 2d 1190, 1194 (Ala. 1998).  The Supreme Court of Alabama, however, rejected the plaintiff's argument that her employer ratified her supervisor's sexually harassing conduct toward her.  See id. at 1195.  The evidence demonstrated that, immediately after receiving notice of the harassment, a hospital administrator directed the supervisor to cease the harassment, and the harassment stopped.  See id. at 1192-93, 1195.  The Court explained that, under a ratification theory,

> "adequate" means that the employer took reasonable and necessary steps to stop the tortious conduct.  In Mardis v. Robbins Tire & Rubber Co., 669 So. 2d 885, 889 (Ala. 1995), this Court held that a plaintiff presented substantial evidence of inadequate corrective action by an employer by showing that the employer failed to investigate or reprimand the co-employee accused of assault and battery.  In contrast, where the specific tortious conduct stops after corrective action by the employer, this Court has held that the corrective action is adequate as a matter of law.

Id. at 1195 (citation omitted); Potts, 604 So. 2d at 401 ("[I]f the undisputed evidence shows that the employer, as soon as it was practical to do so after learning of the conduct, took steps to stop the tortious conduct and *the tortious conduct stopped*, the steps taken by the employer were adequate, as a matter of law.") (emphasis in original).  Similarly, an employer's actions in Joyner v. AAA Cooper Transportation were presumed to be adequate because the tortious conduct stopped after the employee reported the incident and the employer counseled the harasser.  See 477 So. 2d 364, 365 (Ala. 1985).

Here, the record indicates that, on or about April 3, 2002, Holloman and Douglas received actual notice of Jackson's accusation that Angell had sexually harassed her. (Holloman Dep. at 39); (Angell Dep. at 23-25, 33); (Pl. Dep. at 65-66, 71, 103, 228-29); (Douglas Dep. at 88, 109, 138); (Def. Resp. to Pl. 1st Interrogs., No. 7.)  Holloman and Douglas commenced an investigation of the alleged sexual harassment, and Holloman also "sat down" with Angell and informed him in "no uncertain terms" that, if the allegations against him by Jackson proved true, Angell would be fired.  (Holloman Dep. at 20-21.)  Jackson has not disputed that, after the harassment was reported to Holloman and Douglas, she was not subjected to any further incidents of sexual harassment by Angell.  Pursuant to the holdings of the Supreme Court of Alabama, the court finds that the cessation of the harassment entitles Cintas to summary judgment on Jackson's claim that Cintas ratified Angell's conduct.  See Atmore Cmty. Hosp., 719 So. 2d at 1195; Potts, 604 So. 2d at 401.

The court makes one final observation as to Jackson's claim that Cintas ratified the intentional tort of its employee.  In other parts of her brief, Jackson complains about the adequacy of Cintas' investigation.  (See, e.g., Pl. Resp. at 21-23 (Doc. No. 27).)  Only where the employer took *no* action, see Mardis, 669 So. 2d at 889, or where the offending behavior did not stop in spite of alleged remedial measures, see Potts, 604 So. 2d at 401, has the Supreme Court of Alabama discussed the adequacy of the employer's remedial action.  On the other hand, where the employer acted, no matter what the act, and thereafter the harassment ceased, the Supreme Court of Alabama's ratification analysis

48

has ended without mention of the sufficiency of the investigation or the discipline imposed.  See Atmore Cmty. Hosp., 719 So. 2d at 1195.

The facts here are that Cintas did take *some* action, which included a stern warning to Angell and interviews with co-employees.  While Cintas' method of investigation and its ultimate conclusions may seem erroneous and insubstantial to Jackson, the court finds that the alleged inadequacies in the investigation do not preclude the entry of summary judgment because Angell's offending behavior discontinued once Cintas intervened.  The court, therefore, finds that the measures employed by Cintas are adequate as a matter of law and do not support a finding of ratification.  Accordingly, for the foregoing reasons, summary judgment is due to be entered in favor of Cintas on Jackson's tort of outrage claim.

## 2. *Negligent hiring, training, supervision and retention*

Jackson also pleads claims for negligent hiring, training, supervision and retention. (Compl. ¶¶ 54-60 (Doc. No. 1).)  Jackson complains that, despite its "actual notice" of Angell's conduct, Cintas breached its duty of care to her by failing to "discipline or terminate" Angell, "protect" her from further harassment, properly "administer its own policies against harassment," and sufficiently train and "communicate such policy to its agents," namely Angell.  (Id. ¶¶ 56-58.)

(a) Negligent hiring

The court agrees with Cintas that Jackson has not presented any evidence that "Angell committed similar acts for a previous employer and that Cintas knew about these acts or should have discovered these acts in the exercise of due diligence." (Def. Br. at 29 (Doc. No. 47).) As such, the court finds that Jackson has failed to establish the essential elements of her negligent hiring claim. See Sanders v. Shoe Show, Inc., 778 So. 2d 820, 824 (Ala. Civ. App. 2000) (absent evidence that tortfeasor had history of improper conduct similar to conduct alleged or proof to support inference that defendants actually knew, or should have known that tortfeasor would abuse patrons, plaintiff could not establish a claim of negligent hiring); see also Portera v. Winn Dixie of Montgomery, Inc., 996 F. Supp. 1418, 1438 (M.D. Ala. 1998) (entering summary judgment in favor of employer on negligent hiring claim because there was no evidence that employer "knew or could have discovered that [alleged harasser] would engage in sexual harassment before [employer] hired [alleged harasser]."). Accordingly, summary judgment is due to be entered in favor of Cintas on Jackson's negligent hiring claim.

(b) Negligent training, supervision and retention

The Supreme Court of Alabama has stated, in the context of a claim for negligent supervision, training and retention, that

> [i]n the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends

50

> upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.

Armstrong Bus. Servs. v. AmSouth Bank, 817 So. 2d 665, 667 & 682 (Ala. 2001)

(citations and internal quotation marks omitted); see also Zielke v. AmSouth Bank, N.A.,

703 So. 2d 354, 358 n.1 (Ala. Civ. App. 1996) (noting that there is no discernible

distinction between claims of negligent training and claims of negligent supervision).

Further, the "incompetency" of the offending employee in a negligent supervision claim

must be based on an injury resulting from a tort which is recognized under Alabama

common law.  See Stevenson v. Precision Standard, Inc., 762 So. 2d 820, 824 (Ala. 1999)

(affirming summary judgment on negligent supervision/training claim for lack of

underlying tort).

Jackson has not identified the underlying tort claim upon which she relies to

establish her negligent supervision claim.  Cf. id. at 825 n.6 (under Alabama law, "[a]n

independent cause of action for sexual harassment does not exist").  Notwithstanding the

foregoing deficiency, the facts fall short of raising a triable issue of fact as to Cintas'

actual notice because the evidence establishes that, when Cintas received actual notice of

Angell's alleged sexually harassing conduct, it immediately commenced an investigation

into Jackson's complaint, and the harassment ceased.  Cf. Patterson v. Augat Wiring Sys.,

Inc., 944 F. Supp. 1509, 1529 (M.D. Ala. 1996) (allowing negligent supervision claim to

go to the jury because when plaintiff's complaints about the harassing supervisor finally

led to an investigation by the employer, no effective remedial action was taken, and the harassment and retaliation continued and escalated).  While "the manner in which a sexual-harassment complaint is handled when sexual harassment has, in fact, occurred c[an] form the basis for a claim for negligent or wanton supervision," Stevenson, 762 So. 2d at 825, the Supreme Court of Alabama has found such a claim actionable only when the sexual harassment did not stop or ceased only temporarily in spite of the employer's purported corrective action.  See Machen v. Childersburg Bancorporation, Inc., 761 So. 2d 981, 987 (Ala. 1999); Big B, Inc. v. Cottingham, 634 So. 2d 999, 1003-04 (Ala. 1993).

Regarding constructive notice, although the court has found that the sexual harassment was sufficiently severe or pervasive to survive summary judgment under Title VII, Title VII's pervasiveness analysis is not necessarily the equivalent of constructive notice.  See Kelley v. Worley, 29 F. Supp.2d 1304, 1313 (M.D. Ala. 1998).  Jackson emphasizes that Angell sexually harassed her in private, (see, e.g., Pl. Dep. at 75, 92), and there is no evidence that another employee made a similar claim to a managerial employee of alleged sexually harassing conduct by Angell.  The court is not persuaded that the "rumors" of Angell's alleged consensual affair with another subordinate employee is sufficient to place Cintas on constructive notice of Angell's alleged propensity to engage in *unwelcome* sexually harassing conduct.  See, e.g., Zielke v. AmSouth Bank, N.A., 703 So. 2d 354, 360 (Ala. Civ. App. 1996) ("In wanton and negligent training claims, evidence of other acts by the employee [is] admissible to show incompetency and notice to the employer.").

Based on the foregoing, the court finds that there are no genuine issues of material fact regarding Jackson's negligent supervision, training and retention claim against Cintas.  The court, therefore, finds that Cintas' summary judgment motion is due to be granted on this claim.

### 3.  Breach of Contract

Jackson asserts a breach of contract claim, contending that Cintas contractually represented to her through a myriad of documents, including "personnel policies and procedures manuals," that their "employment relationship would be based on good faith, that employees would be treated fairly and equitably, that employees would be judged on the basis of individual merit and ability and that employees would receive just compensation for their services rendered to [Cintas]."  (Compl. ¶ 44 (Doc. No. 1).)

Citing Wyant v. Burlington Northern Santa Fe Railroad, 210 F. Supp.2d 1263 (N.D. Ala. 2002), Cintas argues that Jackson has not shown the existence of a valid contract because Jackson was an at-will employee, as clearly stated in the Partner Reference Guide.  (Def. Br. at 32 (Doc. No. 47).)  As emphasized by Cintas, the Partner Reference Guide which contains Cintas' personnel policies and procedures "specifically disclaims any employment contractual language."  (Id.)  In addition to specifying that "'all employment at Cintas is at will,'" the Partner Reference Guide provides that "'the policies contained in this reference guide are general guidelines only[;] nothing contained

in this reference guide represents any form of contractual agreement or binding promise regarding terms of employment.'" (Id. (citing Laurenzi Aff. ¶ 6 & Guide (Doc. No. 22)).)

An essential element of a breach-of-contract claim is "the existence of a valid contract between the parties." BSI Rentals, Inc. v. Wendt, 893 So. 2d 1184, 1186 (Ala. Civ. App. 2004) (quoting Southern Med. Health Sys., Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala.1995)). In Wyant, the employee asserted a breach-of-contract claim identical to the one asserted by Jackson. In fact, Jackson's claim mirrors, word for word, the claim asserted by the employee in Wyant. See 210 F. Supp.2d at 1293.

Examining whether the personnel policies and procedure manuals were "sufficient to create a contract of employment," the court in Wyant summarized the applicable law:

> The Eleventh Circuit Court of Appeals has stated that an employment relationship is "'permanent,' and thus not terminable 'at will,' if: (1) there was a clear and unequivocal offer of 'permanent' employment, (2) the employee provided some substantial consideration for the contract apart from the services rendered, and (3) the individual making the offer had power to bind the employer." Green v. City of Hamilton, Housing Authority, 937 F.2d 1561, 1564 (11th Cir. 1991); see also Hoffman-LaRoche v. Campbell, 512 So.2d 725, 728 (Ala. 1987). The court in Hoffman-LaRoche, 512 So.2d at 734-35, noted the following:
>> To become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere statement of general policy. . . . Indeed, if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook.

Id. at 1293-94.

The employer in Wyant pointed to its corporate policy and an employee handbook, stating that the disclaimers therein dispelled any notion of a contractual relationship

between it and the employee.  See id. at 1294.  The terminology relied upon by the employer in Wyant is substantially similar to the language in Cintas' Partner Reference Guide.  As in Wyant, this court finds that Cintas' Partner Reference Guide which expressly disavows any contractual agreement as to the terms of employment and emphasizes that all employment is "at will" demonstrates that Cintas did not enter into an "enforceable contract of employment" with Jackson.  Id.  Accordingly, the court finds that summary judgment is due to be entered in favor of Cintas on Jackson's breach-of-contract claim.

### 4. Breach of implied covenant of good faith and fair dealing

Jackson's claim for breach of implied covenant of good faith and fair dealing (see Compl. ¶¶ 50-53 (Doc. No. 1)), fails based on the absence of a contract of employment.  See Wyant, 210 F. Supp.2d at 1295.  The claims is not cognizable for the additional reason that Alabama law "does not recognize this type of claim outside insurance claims."  Id. at 1294-95.  Summary judgment, therefore, is due to be entered in favor of Cintas on Jackson's claim for breach of implied covenant of good faith and fair dealing.

## VI. ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendant Cintas Corporation's motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part as follows:

(1) DENIED on Plaintiff Jennifer Jackson's Title VII sexual harassment claim; and

(2) GRANTED on Plaintiff's state law claims.

DONE this 30th day of September, 2005.

/s/ Ira DeMent _____
SENIOR UNITED STATES DISTRICT JUDGE